### GRUBB v. STANOLIND OIL & GAS CO.
### No. 3366.

Court of Civil Appeals of Texas. Beaumont.

Nov. 25, 1938.

Rehearing Denied Dec. 7, 1938.

Vinson, Elkins, Weems & Francis, Geo. E. B. Peddy, Lawler, Wood & Childress, and Virgil Childress, all of Houston, for appellant.

W. J. Williamson, Andrews, Kelley, Kurth & Campbell, Harry R. Jones, E. J. Fountain and A. W. Bounds, all of Houston, and L. A. Thompson, Jr., Donald Campbell, and Clay Tallman, all of Tulsa, Okl., for appellee.

O'QUINN, Justice.

This is an action in trespass to try title involving the 7/8ths oil, gas and mineral leasehold estate in approximately 3 acres of land described and known as Tract No. 143 of South Houston Gardens No. 6 in Harris County, brought by the Stanolind Oil & Gas Company against Maurice T. Grubb. The defendant, Grubb, answered by general demurrer, general denial, and a plea of not guilty. In the alternative he plead the facts relative to the acquisition of his title to the property involved, and prayed for judgment.

The case was tried to a jury, but at the conclusion of the evidence plaintiff's motion for an instructed verdict was granted and judgment rendered in favor of the Stanolind Oil & Gas Company for the title and possession of the 7/8ths oil, gas and other mineral estate in the land in controversy. This appeal is from that judgment.

Both parties have filed able and complete briefs presenting many interesting propositions and counter propositions, but we shall not discuss them in detail, but only such as are believed to be necessary to a disposition of the appeal.

F. C. Williams and wife are the common source. On September 15, 1927, they owned Lot or Tract No. 143 of about 3 acres in South Houston Gardens No. 6, the land in controversy. On that date they entered into a contract to sell and convey same to W. B. Tate and his wife for a consideration of $1500, the same to be paid $150 cash and the remainder $25 per month, with interest at the rate of eight per cent per annum, and upon the completion of said payments, to make to said Tate a good and sufficient warranty deed to said land. The contract contained the following: "We agree to carry this contract in full force for 30 days after payment is due but in accordance with agreement signed by the purchaser above

named which agreement is made a part hereof, the said purchaser agrees that he will make all the payments when due and should default be made in any payment for a period of 30 days after due then all previous payments shall be forfeited to Mr. and Mrs. F. C. Williams as rental charges for the possession of the above described property from the date of this contract and this contract for deed shall be null and void thenceforth. The above named purchaser shall in that event be likewise relieved from all responsibility under this contract."

The cash payment of $150 was made, and the monthly payments of $25, fairly well met up to October, 1929, four being passed in 1928, and four in 1929. $300 in payments were made in 1930, two in cash and the rest in labor and property. Only two payments were made in 1931. Four half payments were made in 1932, and one for $2.50. There was $7.50 paid in 1933, one for hauling, $5 and on June 15, 1933, $2.50 cash. On June 15, 1933, the balance due on principal and interest amounted to approximately $950. No further payments were made. On April 18, 1933, Williams wrote Tate saying that he had been informed that Tate had secured employment and urging him to make payments on the property. This letter was registered and was received by Tate. To this he received no reply, nor were any payments made. On December 10, 1933, Williams wrote Tate as follows:

"Houston, Texas,
"Dec. 10, 1933.

"Mr. Wesley Tate,
"Houston, Texas.

"Dear Mr. Tate:

"In as much as you have not made a payment on your contract since June 1933 and you understand that your contract is subject to cancellation after sixty days, this is your notice that I have today cancelled your contract and it is of no further force and effect after this date (October 9, 1933)."

"Trusting that this will meet with your approval, I am,

"Very truly yours, F. C. Williams"

After the contract of purchase, Mr. Tate and his wife moved onto the land and lived there until about July 4, 1933, when they had some domestic trouble and Tate left. Some three or four weeks after this, Mrs. Tate left the property and moved to Houston. She removed all household furniture from the place. They never lived together after this, nor did either of them return to the property. After they left the property Mr. Williams took possession of the place and lived there—he and his wife were having some domestic friction, and she remained where they had been living and he went to the Tate place —Lot 143 involved here, and remained there for some time, and later placed his daughter in possession and she lived there. Smith Thompson, brother-in-law to Tate (married Tate's sister) testified that Tate showed him the letter from Williams notifying him that the contract to purchase was cancelled, and said that Tate told Mr. and Mrs. Williams in his presence that he couldn't pay for the property and was going to give it back to Williams. In the meantime Mrs. Tate had filed suit for divorce against Tate. This suit was not tried as Tate was shortly afterwards killed accidentally on March 8, 1934. Mrs. Thompson (Tate's sister) testified that shortly before Thanksgiving, 1933, Tate visited her and while there told her that he could not pay for the place and intended to give it back to the Williamses—he said "I am going to turn the property over to Mr. and Mrs. Williams because I can't take care of it". Also that in her presence he told Mr. and Mrs. Williams that "I am not going to be able to take care of this bill I owe against the place and you have been so kind to me I want to turn the place back to you." This was after the Tates had separated and left the property, and after Williams had written the letter to Tate notifying him the contract was cancelled. After this conversation of Tate's with the Williamses, Williams took possession of the premises, lived on it for a while, and then put his daughter on same.

On December 31, 1934, F. C. Williams and wife executed an oil and gas lease covering lot or Tract 143, the land involved, to H. H. Hay. This lease, on January 2, 1935, was assigned and transferred by Hay to Ralph A. Johnston, who on same day transferred and assigned same to the Stanolind Oil & Gas Company, plaintiff herein.

After the death of Tate on March 8, 1934, Mrs. Tate married W. J. Smith. She testified that about three days after her husband's (Tate's) death (about March 12, 1934), she went to the place and while

there saw Mrs. Williams and that she told Mrs. Williams that she, Mrs. Tate, expected to get compensation insurance because of her husband's death, and that when she got the insurance money she wanted to pay the balance due on the place, and that Mrs. Williams said that she would be glad for her to do so. She further testified that some time in May, 1934, she and her attorney, Hon. States Jacobs, went to see Mr. Williams at his place of business to tell him that she was expecting to receive compensation insurance and when she got it she wanted to pay the place out, and that Mr. Williams told her that he would be willing to wait a year if he could get the balance in cash. That she told him they (she and her attorney) thought the money would be paid her in about six months. That Williams said he would rent the place and apply the rent on the debt until she got the insurance. That she asked Williams what was the balance due, and that Mr. Jacobs asked him would he send them a letter stating the amount. That on May 30, 1934, Mr. Williams sent her attorneys a letter which reads:

"South Houston, Texas,
"May 30, 1934.
"Allen, Helm, Jacobs & Settegast Attys.
"Sterling Building,
"Houston, Texas.
"Gentlemen:

"Having checked over the stubs of our receipt book, we find a total balance of $490.00 principal unpaid. Now if Mrs. Tate could raise that amount cash, we will be willing to forget about the interest due.

"We are very much in need of the money, as we have obligations to be met, depending upon the payments from the Tates to help us to meet them.

"Please advise Mrs. Tate to look up her receipts and see if above amount is correct.

"Very Truly Yours,
"Mr. and Mrs. F. C. Williams."

She testified that she received $623.00 compensation insurance on December 22, 1934. It appears that on December 24, 1934, she purchased an automobile paying a portion of this money. She said that about "four or five days after Christmas" she called Williams over the phone and told him she had received the compensation insurance and asked should she bring him the money to pay the balance due on the place, or would he call and get it and that Williams replied that he would not accept it. We gather from the record at this time there was considerably more than that amount, principal and interest due on the property.

On May 9, 1935, Mrs. Tate, before she married Mr. Smith, executed to Mr. Grubb, appellant, an oil and gas lease covering the property.

Pending this litigation, by consent of the parties, development of the property for oil was begun, and at the time of the trial there were two producing wells.

■ While the suit was brought as one of trespass to try title, it is really a contest between the oil leases held by appellant and appellee. We have stated sufficient facts, we believe, to determine the rights of the litigants under the leases. Under the facts measured by the terms of the contract of sale, when the Tates repeatedly failed to make payments as stipulated in the contract, Williams had the right to and did rescind and cancel the contract, as he did by letter of December 10, 1933, stating "I have this day cancelled your contract and it is of no further force and effect after this date (October 9, 1933)", and later took possession of the property. There is no contention that any payment had been made for several months before that date. This letter was received by Tate. Before this letter was written, in the summer of 1933, the Tates had left the premises, first, Tate, on July 4th, and then his wife in August, and Mrs. Tate had removed from the premises all their household goods. In April before, Williams had written to Tate asking for payments. No response was made to this letter either in person, by letter, or by making any payment. The payments before that time for two years had been irregular and few in number. Under the contract Williams was fully justified in rescinding the contract. After the letter giving notice of the rescission, Tate stated to his sister, brother-in-law, and others, and to Mr. and Mrs. Williams, that he could not meet the payments and wanted to return the property to them, and asked them to take it back. He thus acquiesced in the cancellation of the contract and surrendered the property.

■ On December 31, 1934, Williams and wife executed an oil and gas lease to Hay, who on January 2, 1935, assigned

it to Johnston, and he, in turn, on same day assigned the lease to the appellee, Stanolind Oil & Gas Company. Tate died March 8, 1934. After his death Mrs. Tate testified that she went to the Williamses and informed them that she wished to pay the balance due on the property, and told them she expected to get some compensation insurance money because of the death of her husband, and they agreed with her that she could do so, and that they would wait until she received the insurance money. The evidence discloses that the lease to Hay by the Williamses was at a time (December 31, 1934) when the Tate contract was of no force because same had been rescinded for failure to make payments according to its terms. The lease asserted by Grubb was executed by Mrs. Tate to him on May 9, 1935. This was long after the execution of the Hay lease under which appellee claims. So, Stanolind Oil & Gas Company took title before the execution by Mrs. Tate of the Grubb lease and without notice of Mrs. Tate's claim of right to pay under her alleged oral agreement if and when she had received compensation for the death of her husband. But appellant insists that though the Hay lease held by appellee was executed after the contract to purchase was rescinded, still its prior grantee, Hay, at the time he took the lease from the Williamses had notice of the purchase contract of the Tates, and of its breach, and that Mrs. Tate was asserting a claim to the property, and so was not an innocent purchaser. The record discloses that Hay did have notice of the Tate contract to purchase and of its breach by the Tates, and of the abandonment or removal from the property by them, and that Williams had rescinded the contract by written notice to them, and had taken possession of the property after it was vacated by the Tates, but we do not find in the record that Hay had any notice of the claimed reviver and extension of the contract as testified to by Mrs. Tate. In order for the extension of the contract as claimed by Mrs. Tate to have affected the rights of appellee, it must be shown that it had notice of same. As stated, we do not find such in the record. Browne v. King, 111 Tex. 330, 235 S.W. 522.

What we have said disposes of the case, and renders discussion of the other questions unnecessary. The judgment should be affirmed and it is so ordered.

Affirmed.